Jonathan K. Levine (State Bar No. 220289)
  jkl@girardgibbs.com
Elizabeth C. Pritzker (State Bar No. 146267)
  ecp@girardgibbs.com
Daniel T. LeBel (State Bar No. 246169)
  dtl@girardgibbs.com
**GIRARD GIBBS LLP**
601 California Street
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Attorneys for Individual and Representative
Plaintiffs Clarke and Rebecca Wixon and
Norman and Barbara Wixon

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Clarke and Rebecca Wixon and Norman and Barbara Wixon, on behalf of themselves and all others similarly situated,<br><br>                  Plaintiffs,<br><br>        v.<br><br>Wyndham Resort Development Corp. (f/k/a Trendwest Resorts, Inc.), Gene Hensley, David Herrick, John Henley, Peggy Fry and John McConnell<br><br>                  Defendants. | Case No. C 07 2361 JSW<br><br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**CLASS ACTION** |

Plaintiffs Clarke and Rebecca Wixon and Norman and Barbara Wixon (collectively, "Plaintiffs") allege on behalf of themselves and all others similarly situated the following:

## I.

## JURISDICTION AND VENUE

1.      The Court has subject matter jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  This is a civil action in which the matter in controversy exceeds the value of $5,000,000, exclusive of interest and costs, and this is a class action in which more than two-thirds of the proposed plaintiff class, on the one hand, and Defendants, on the other, are citizens of different states.  Defendant Wyndham Resort Development Corp. ("Wyndham") is an Oregon corporation with headquarters in Redmond, Washington.  Defendants Gene Hensley, David Herrick and Peggy Fry are citizens of Washington.  Defendant John Henley is a citizen of Gold Coast, Australia, and Defendant John McConnell is a citizen of Florida.

2.      Defendant Wyndham is subject to jurisdiction in this District by virtue of its extensive business dealings and transactions within the State of California.  Wyndham is registered to do business in the State of California and, as a seller of timeshares in California, has consented to regulation by the California Department of Real Estate.  Wyndham has approximately fourteen (14) sales offices in California.

3.      Defendants Hensley, Herrick, Henley, Fry and McConnell (collectively the "Director Defendants") are subject to jurisdiction in this District by virtue of their extensive business dealings and transactions within the State of California.  The Director Defendants are or were members of the Board of Directors of Worldmark, The Club ("Worldmark"), a California mutual benefit corporation owned by its members and managed by Defendant Wyndham.  This suit arises from the Director Defendants' conduct as directors of Worldmark.

4.      Venue is proper in this District under 28 U.S.C. § 1391(c) because certain Plaintiffs reside in the District, Plaintiffs purchased timeshare interests from Wyndham while in this District and Wyndham maintains offices within the District.

///

///

AMENDED COMPLAINT

## II.

## PARTIES

5.      Plaintiffs Clarke and Rebecca Wixon are citizens of California, residing in San Mateo, California.  They purchased timeshare interests (denominated as "Vacation Credits") in Worldmark from Wyndham.  The Wixons currently own 20,000 Premier Vacation Credits, four times the minimum amount required for membership in Worldmark.  They have been damaged and have suffered economic harm due to Defendants' actions, as more fully described herein.

6.      Plaintiffs Norman and Barbara Wixon are citizens of Colorado, residing in Parker, Colorado.  They purchased 10,000 Worldmark Premier Vacation Credits (twice the minimum amount required for membership) from Wyndham while staying at a Wyndham-managed Worldmark resort in Windsor, California.  They have been damaged and have suffered economic harm due to Defendants' actions, as more fully described herein.

7.      Defendant Wyndham Resort Development Corp. (formerly known as Trendwest Resorts, Inc. ("Trendwest")), is an Oregon corporation, with its principal place of business in Redmond, Washington.  Trendwest was created in March 1989 by Jeld-Wen Inc., a privately-held company based in Klamath Falls, Oregon.  Trendwest began selling Worldmark Vacation Credits in October 1989.  In August 1997, Trendwest became a publicly traded company.  In April 2002, Trendwest was acquired by Cendant Corporation ("Cendant"), and became a wholly-owned subsidiary of Cendant, included as a part of Cendant Timeshare Resort Group, Inc.  In May 2006, Cendant Timeshare Resort Group, Inc. was renamed Wyndham Vacation Ownership, Inc.  In August 2006, Cendant spun off Wyndham Worldwide Corp., which included Trendwest as a part of Wyndham Vacation Ownership, Inc.  In January 2007, Trendwest was renamed Wyndham Resort Development Corp.  As used herein, "Wyndham" refers to and includes all predecessors, including "Trendwest".

8.      Defendant Gene Hensley is the President of Worldmark's Board of Directors and the Chief Executive Officer of Worldmark.  He has been a member of Worldmark's Board for more than ten years.  He has been a senior executive of Wyndham since 1990 and, until his recent retirement from Wyndham, was Wyndham's Chief Operating Officer.

9.      Defendant David Herrick is a member of Worldmark's Board of Directors.  He has

2

AMENDED COMPLAINT

been a member of Worldmark's Board of Directors since February 2007, when he was appointed by the Board to replace Defendant McConnell. Herrick is a Senior Vice President of Wyndham, and is responsible for overseeing all aspects of Worldmark's operations.

10.     Defendant John Henley is a member of Worldmark's Board of Directors. He has been a member of the Board since 1994. Until his recent retirement, Defendant Henley was the President of Wyndham South Pacific, an affiliate of Wyndham.

11.     Defendant Peggy Fry is a member of Worldmark's Board of Directors. She has been a member of the Board since 2005, when she was appointed by the Board to replace Don Harrill, a departing Board member who was also a senior Wyndham executive. Defendant Fry is the Vice President of Owner Services for Wyndham, where she has been employed for more than thirteen years.

12.     Defendant John McConnell is a former member of Worldmark's Board of Directors. He served on the Board from 2002 until February 2007. McConnell was the President and Chief Executive Officer of Wyndham Vacation Ownership, Inc., the parent company of Worldmark by Wyndham.

13.     Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this lawsuit.

14.     Defendants, and each of them, have participated as members of the improper acts or acted with or in furtherance of them, or aided or assisted in carrying out their purposes as alleged in this Complaint, and have performed acts and made statements in furtherance of the violations and conspiracy.

## III.

## SUBSTANTIVE ALLEGATIONS

**A.      The Relationship between Wyndham and Worldmark**

15.     Wyndham purchases and develops the properties that become Worldmark resorts. Upon completion of development, Wyndham transfers complete ownership of the properties to Worldmark. Wyndham retains the rights to market the properties and to sell the original timeshare interests created by the development of each property. Wyndham also is the managing agent for all of the Worldmark properties.

16.     Worldmark is a California mutual benefit corporation owned by its members.

AMENDED COMPLAINT

1    Worldmark owns, operates and maintains all of the Worldmark properties on behalf of its members.

2    There are currently more than 60 Worldmark resorts in the United States, Canada, Mexico and Fiji.

3    Most Worldmark resorts in the United States, Canada and Mexico are within driving distance of a major

4    metropolitan region.

5         17.    Worldmark is run by its Board of Directors.  Worldmark's Board of Directors is, and

6    always has been, dominated and controlled by current and former Wyndham officers and executives.

7    Four of the five Directors currently on Worldmark's Board (the Director Defendants) are or recently

8    were employed by or affiliated with Wyndham as senior executives.

9         18.    Wyndham profits from the Worldmark development scheme through the sale of

10   Worldmark Vacation Credits and from the management fees it receives from Worldmark.  Wyndham

11   maintains the exclusive right to market and sell the original Vacation Credits that are created each time

12   it develops a new resort and ownership is then transferred to Worldmark.  The number of Vacation

13   Credits generated by each additional new Worldmark property is determined by the size of the resort,

14   the value of a night at the resort in comparison to other comparable Worldmark resorts (known as

15   "relative use-value"), and the number of nights in the year available for usage by Worldmark members.

16   For example, a new resort with 100 rooms, each valued at 1,200 credits per night, would generate

17   40,440,000 Vacation Credits to be sold by Wyndham (100 rooms x 1,200 credits per room x 337 nights

18   of usage per year (historically, one week is set aside for maintenance and three weeks are set aside to

19   ensure Bonus Time availability)).  When purchased through Wyndham, each Vacation Credit currently

20   costs approximately $1.77.

21        19.    Worldmark pays Wyndham substantial fees for the ongoing management of the

22   Worldmark resorts.  At its inception in 1989, Worldmark entered into a management agreement with

23   Wyndham.  The management agreement sets forth Wyndham's obligations and rights as the managing

24   agent of the Worldmark resorts and provides that Wyndham will receive a significant management fee

25   from Worldmark in exchange for performing its management duties.  The management fee for 2006 was

26   approximately $8.3 million.  The management agreement automatically renews each year. Despite the

27   fact that Wyndham has taken a number of actions contrary to the interests of Worldmark members and

28   breached its contract with Worldmark members, Worldmark's Board of Directors, dominated and

1    controlled by Wyndham, has never sought to cancel or renegotiate the management agreement or to put

2    the agreement out for competitive bidding.

3    **B.**    **Wyndham is Sued by the State Of California**

4    20.    In October 2003, the California Attorney General and the District Attorney for the County

5    of San Mateo sued Wyndham in the Superior Court in San Mateo County (*The People of the State of*

6    *California v. Trendwest Resorts, Inc.*, CIV43529).  The complaint, filed on behalf of the People of the

7    State of California, alleged that Wyndham engaged in the unauthorized sale of goods, products and

8    services in California, that Wyndham made material misrepresentations in the marketing of its products

9    and services, and that Wyndham engaged in unfair and unlawful sales practices.

10    21.    Specifically, the complaint alleged that Wyndham made material misrepresentations to

11    lure consumers to attend Worldmark sales presentations, that during those sales presentations, Wyndham

12    materially misrepresented the nature, value, terms and conditions of Worldmark membership, that

13    Wyndham failed to disclose that consumers had a right to cancel their contract, and that Wyndham

14    engaged in coercive sales tactics.  The complaint alleged violations of §§ 17200 and 17500 of the

15    California Business and Professions Code.

16    22.    Simultaneous with the filing of the complaint, Wyndham consented to the entry of a Final

17    Judgment and Permanent Injunction.  The Final Judgment permanently enjoins Wyndham from

18    engaging in any of the practices and acts alleged in the complaint and summarized above.  The

19    settlement also required Wyndham to notify new Worldmark members of the Judgment and offer to

20    rescind their Vacation Credit purchases.  Finally, Wyndham paid $1.475 million to the Office of the

21    Attorney General and the San Mateo County District Attorney's office.

22    **C.**    **How Worldmark Membership Works**

23    23.    In a traditional timeshare, a participant typically purchases a fractional interest in a

24    specific piece of property.  The participant owns the right to a specific week of occupancy in a specific

25    unit in a specific resort.  While the participant may be entitled to trade that week for a week in some

26    other resort, what the participant is purchasing is a guaranteed week in a specific unit of a specific resort.

27    24.    Worldmark is not a traditional timeshare.  Worldmark members do not purchase the right

28    to usage for a specific week or a specific unit or a specific resort.  Instead, Worldmark members

purchase Vacation Credits, which can be used (like currency) at any Worldmark resorts (and other affiliated resorts throughout the world) at any time, depending only on availability and whether the member possesses enough Vacation Credits to make the reservation.

25.     A person who owns at least 5,000 Worldmark Vacation Credits is a Worldmark member. However, the minimum initial purchase requirement for Worldmark Vacation Credits purchased from Wyndham is 6,000 Vacation Credits. Most Worldmark members own substantially more than 5,000 Vacation Credits. There are two types of Vacation Credits – Standard and Premier. Standard Vacation Credits renew annually for 40 years and then expire. They do not include Bonus Time (described below). Premier Vacation Credits renew annually in perpetuity and include Bonus Time. Almost all Worldmark members purchase Premier Vacation Credits. For the purpose of this Complaint, the term "Vacation Credits" refers to Premier Vacation Credits and the term "Worldmark members" refers to those members owning at least 5,000 Worldmark Premier Vacation Credits.

26.     One of the fundamental principles, and key selling points, of Worldmark membership is that all members are treated equally in terms of the ability to make reservations, regardless of how many Vacation Credits any particular member may own. While Worldmark members who own more Vacation Credits may be able to book longer or more frequent vacations, no member has priority over another member in making reservations.

27.     This "first-come, first-served" policy has been in existence since Worldmark was founded in 1989 and is presented as one of the key membership rights and benefits in all of the governing documents available to prospective and current Worldmark members, including (a) the California Permit filed with the California Department of Real Estate, (b) the official Worldmark Guidelines (Rules), (c) the Worldmark Bylaws, (d) the Declaration of Vacation Owner Program ("Declaration") filed and recorded in every county in California (and elsewhere) where a Worldmark resort is located, (e) the Management Agreement with Wyndham, (f) the Security Agreement (Retail Installment Contract), (g) the Owner Understanding, and (h) the Worldmark Owner Education Guide. These documents are hereinafter collectively referred to as the "Governing Documents."

28.     The Governing Documents form the basis of the bargain between Wyndham and Worldmark members and are provided to all Worldmark members before the purchase of Vacation

AMENDED COMPLAINT

Credits.  The Governing Documents collectively form the contract between Wyndham and all Worldmark members.

29.     The Governing Documents state that Worldmark members can make only two types of reservations – Vacation Credit Reservations and Bonus Time Reservations.  Vacation Credit Reservations can be booked up to 13 months in advance and must be reserved using annual Vacation Credits.  All Worldmark locations and dates are available on a first-come, first-served basis for Vacation Credit Reservations.  Bonus Time Reservations can be booked up to 14 days in advance and must be reserved and paid for in cash based upon a formula established by Worldmark.  The current formula is $.044 for each Vacation Credit that would be required to reserve the same unit under a Vacation Credit Reservation.

30.     Bonus Time Reservations serve two important purposes, and are a key membership right and benefit.  First, they enable Worldmark members to use Worldmark resorts on short notice and at a discounted rate without using up their annual Vacation Credits.  This is an important benefit because most Worldmark resorts are within driving distance of major metropolitan regions and can be used by members for short-notice vacations and weekend trips.  In 2006, Worldmark estimated that Bonus Time Reservations equivalent to more than 309 million Vacation Credits would be booked by Worldmark members.  Second, Bonus Time Reservations are paid for in cash, and the payments go directly to Worldmark.  These cash payments are mutually beneficial to Worldmark and Worldmark members because the payments defray the operating costs of the resorts, help keep annual member dues down, and fill rooms that would otherwise go unoccupied.  In 2006, Worldmark estimated that Bonus Time Reservations would result in revenues to Worldmark of approximately $13 million.  All Worldmark locations and dates are available on a first-come, first-served basis for Bonus Time Reservations, assuming that there is availability 14 days or less before travel.

31.     Because Worldmark operates more like a hotel chain (with multiple resorts and different types of accommodations available for reservation at any time), and less like a typical timeshare resort, the rights, rules and regulations concerning the Worldmark reservation system are important to Worldmark members.

32.     The rights, rules and regulations concerning Worldmark reservations are detailed

in the Governing Documents.  None of the Governing Documents allow for any type of reservation other than a Vacation Credit Reservation or a Bonus Time Reservation.  None of the Governing Documents allow any person or entity to reserve time ahead of the schedules for Vacation Credit Reservations and Bonus Time Reservations described above.  The Governing Documents provide that only Worldmark's members or its Board of Directors can change the reservation guidelines and rules and that Wyndham is required to implement the reservation guidelines and rules established by Worldmark and its members.  The Governing Documents also provide that once Wyndham has transferred the properties to Worldmark, Wyndham cannot enter into any transaction which can cause loss of usage at the properties for Worldmark members.  Finally, because Wyndham at all times retains a significant number of unsold Vacation Credits, in order to ensure that Wyndham does not use its Vacation Credits for its own purposes, to the detriment of Worldmark members, the Governing Documents specifically limit Wyndham's right to use the Worldmark resorts for sales purposes.

33.     Because Bonus Time is a key membership right and benefit, since Worldmark was founded in 1989 until shortly after Wyndham acquired Trendwest, for every new resort transferred to Worldmark from Wyndham, only 48 weeks of Vacation Credits were sold by Wyndham.  The remaining four weeks were set aside, with one week for maintenance and three weeks to ensure that there would be some Bonus Time availability.  With the exception of the Worldmark resorts in exotic locations, all 46 Worldmark resorts from inception in 1989 through 2003, have set aside three weeks worth of Vacation Credits which are not sold, to ensure Bonus Time availability for Worldmark members.  The number of weeks sold at each resort, and thus, the number of weeks set aside to ensure Bonus Time availability for Worldmark members, is disclosed to both existing Worldmark members and to prospective members.  For example, Trendwest's 2001 report on Form 10-K states that: "At non-exotic resorts (exotic resorts are Hawaii, Mexico and Fiji), only 48 weeks of time of each unit are available for sale to Owners leaving 4 weeks for Bonus Time and maintenance and upkeep on the units."

34.     Another fundamental principle, and key selling point, of Worldmark membership is that Worldmark members are "buying tomorrow's vacation at today's price."  There are two elements to this concept.  First, credit values for each new resort are established before the resort is transferred from Wyndham to Worldmark.  Once the credit values for the resort have been established, under the

1    Governing Documents, they can never be changed (the total credit value for the resort must remain

2    constant, though the values can be adjusted within the resort).  What this means is that a resort

3    transferred to Worldmark in 1990, for example, will cost Worldmark members the same amount of

4    Vacation Credits per night regardless of whether a vacation is booked in 1991 or 2007.  Second, the

5    Governing Documents require that Wyndham allocate credit values for each new resort based on the

6    relative use-value of the new resort compared to existing resorts.  For example, if existing resorts value a

7    one bedroom at peak time at 8,000 Vacation Credits for a week, then a new resort with the same relative

8    use-value must also value its one bedroom units at 8,000 Vacation Credits for a week during peak time.

9    This ensures that as new resorts are added to Worldmark, existing members who purchased Vacation

10   Credits based on credit values for resorts already operating will also have sufficient Vacation Credits to

11   use all of the new resorts as well.

12        35.    From Worldmark's inception in 1989 until shortly after Wyndham acquired Trendwest,

13   47 resorts were added to Worldmark (with the exception of the exotic locations), and they all had the

14   same or essentially the same credit values, reflecting the fact that every resort, regardless of location,

15   had the same relative use-value to Worldmark members.  This was true even though these resorts were

16   located in Canada, throughout the United States and in Mexico, and even though these resorts were built

17   over a period of more than 14 years.

18        **D.    The Resale and Rental Market for Worldmark Vacation Credits**

19        36.    Vacation Credits may be transferred entirely or partially at any time and without

20   limitation to the number of transfers, through sale, gift, inheritance, dissolution of marriage, or by any

21   operation of law.  Since Worldmark was founded in 1989, Worldmark members who purchased

22   Vacation Credits on the open market have had the same rights and privileges as members who purchased

23   Vacation Credits directly from Wyndham.  With the advent of the Internet and the increase in the

24   number of Worldmark members in the United States over the years, an active resale market has arisen

25   for Worldmark Vacation Credits.  There are a number of websites devoted exclusively to the resale of

26   Worldmark Vacation Credits.

27        37.    Because (at least in part) those Worldmark members selling Vacation Credits on the

28   resale market do not have the significant overhead and marketing expenses that Wyndham has, the price

per Vacation Credit on the resale market is significantly lower than the price per Vacation Credit purchased from Wyndham. Currently, Wyndham sells Vacation Credits for approximately $1.77 per Credit, while a Vacation Credit can be purchased on the resale market for about $0.70. This significant price differential, coupled with the fact that Vacation Credits purchased on the resale market are no different than those purchased from Wyndham, has had a material negative impact on sales of Vacation Credits by Wyndham.

**E.    Wyndham Acquires Trendwest and Uses its Control of Worldmark's Board of Directors to Enrich Itself to the Detriment of Worldmark Members**

38.    Since Wyndham has acquired Trendwest and assumed control of Worldmark's Board of Directors, Wyndham and the Director Defendants have taken a number of actions that are contrary to the interests of Worldmark members and violate the Governing Documents. Since Wyndham acquired Trendwest in 2002, membership dues for Worldmark members have increased five times. Housekeeping fees, which had remained constant from the inception of Worldmark in 1989 through 2003, have increased twice since then. Wyndham has instituted a new program, called TravelShare, to force existing Worldmark members to purchase additional Vacation Credits from Wyndham and to destroy the thriving resale market for Vacation Credits, because the resale market takes sales away from Wyndham. Wyndham unilaterally has abandoned several fundamental principles guaranteed to all Worldmark members by the Governing Documents, including first-come, first-served reservations, the availability of Bonus Time reservations and the application of relative use-values to set credit values at every new resort being transferred from Wyndham to Worldmark. Wyndham also has begun setting aside hundreds of Worldmark units at popular resorts during peak seasons to use for its own purposes, in direct violation of the Governing Documents, which limit Wyndham's use of existing resorts for sales purposes.

**1.    Wyndham Implements the TravelShare Program to Force Existing Members to Purchase Additional Vacation Credits and Destroy the Resale Market for Vacation Credits**

39.    In November 2006, Wyndham implemented a program called "TravelShare." In order to join Travelshare, existing Worldmark members must purchase an additional 5,000 Vacation Credits directly from Wyndham, while new Worldmark members must purchase at least 6,000 Vacation Credits

directly from Wyndham.  Once in TravelShare, the annual dues payable to Wyndham are anywhere from $74 to $530, depending on the number of Vacation Credits owned.  This is over and above the annual Worldmark membership dues payable to Worldmark.

40.     The TravelShare program purports to contain a number of benefits for Worldmark members.  TravelShare benefits include the ability to make "Fun Time" reservations between 15 and 42 days prior to arrival, membership in RCI (a resort exchange club owned by Wyndham's parent company), access to various travel-related services offered by other Wyndham companies, and other incidental benefits such as e-mail reservation reminders and complimentary movie rentals.  There are four tiers of membership in TravelShare: Standard, Elite, Diamond Elite and Platinum Elite.  All of the tiers include the basic TravelShare benefits.

41.     Virtually all of the benefits offered by TravelShare already are available to Worldmark members without the significant expense and restrictions imposed by the TravelShare program.  For example, membership in RCI is available to all existing and new Worldmark members for an $89 annual fee, which in most instances is significantly less than the annual fee for TravelShare.  Similarly, existing Worldmark members already have access to the various travel-related services offered by other Wyndham companies.

42.     The one benefit not available to existing Worldmark members is "Fun Time."  Fun Time is substantially similar to Bonus Time, with one significant exception.  Fun Time reservations can be booked up to 42 days before arrival, as opposed to 14 days before arrival under Bonus Time.  Because the ability to make short-term reservations in most of the Worldmark resorts is limited by demand, particularly at the popular resorts near metropolitan regions, the ability of a Worldmark member to make a short-term reservation up to 42 days before arrival is a valuable benefit, as it gives those Worldmark members who join TravelShare a priority over all other Worldmark members in terms of booking short-term reservations.

43.     Fun Time represents a material and detrimental change in Worldmark's fundamental guarantee, namely, the right to reservations on a first-come, first-served basis.  This change was instituted unilaterally by Wyndham (with the knowledge and assistance of the Director Defendants) without the consent of Worldmark members and violates the provisions in the Governing Documents

1    setting forth the relative rights and obligations of Wyndham, Worldmark and Worldmark members. Fun

2    Time does not benefit Worldmark or its members. Instead, Fun Time was implemented solely to benefit

3    Wyndham at the expense of existing Worldmark members.

4         44.    TravelShare benefits Wyndham, to the detriment of Worldmark members, in a number of

5    ways. First, proceeds from the sale of Fun Time go to Wyndham, not Worldmark. As a result,

6    Worldmark will see decreased revenues from the sale of Bonus Time reservations, which may in turn

7    increase the annual dues for existing Worldmark members to compensate for the lower Bonus Time

8    revenues. Second, while Wyndham claims that none of the expenses required to implement TravelShare

9    will be paid by Worldmark, in fact, in order to provide TravelShare benefits at the various Worldmark

10   resorts, Wyndham uses Worldmark-funded employees and has not hired separate employees at its own

11   expense. Wyndham also appears to have covered the cost of the free housekeeping provided for Fun

12   Time reservations by implementing a general increase in housekeeping charges for all Worldmark

13   members. This increase was announced the same time that TravelShare was announced and represents

14   only the second increase in housekeeping charges in Worldmark's 18 year history (the first increase was

15   only a few years earlier). Third, Fun Time places Wyndham and TravelShare members ahead of

16   Worldmark members in terms of making short-term reservations, in violation of the longstanding

17   Worldmark guarantee and right of first-come, first-served reservations. Fourth, there are no provisions

18   in any of the Governing Documents allowing for another form of reservation other than either a

19   Vacation Credit reservation or a Bonus Time reservation. In other words, Fun Time reservations are

20   neither contemplated nor permitted under the Governing Documents. Fifth, Wyndham has designed

21   TravelShare to create an artificial distinction between Vacation Credits purchased from Wyndham and

22   those purchased on the resale market. This was done intentionally to force potential Vacation Credit

23   purchasers to pay more for Vacation Credits from Wyndham, rather than less on the resale market. This

24   artificial distinction created by TravelShare will further diminish the value of the Vacation Credits held

25   by existing Worldmark members.

26        45.    TravelShare (i) forces existing Worldmark members to incur significant one-time and

27   recurring costs to maintain their first-come, first-served access to short-term reservations, and (ii)

28   imposes retroactive restrictions on the resale and use of Vacation Credits to the detriment of

1   existing Worldmark members.

2        46.    Regardless of how many Vacation Credits an existing Worldmark member currently

3   owns, to become a member of TravelShare and continue to have first-come, first-served access to short-

4   term reservations, the Worldmark member must purchase an additional 5,000 Vacation Credits directly

5   from Wyndham.  This essentially forces existing Worldmark members to purchase an entirely new

6   membership at the inflated Wyndham price rather than the reduced resale market price.  Once a

7   Worldmark member has purchased the 5,000 additional Vacation Credits from Wyndham and become a

8   member of TravelShare, the member must pay a monthly "TravelShare" fee to Wyndham on top of the

9   regular monthly Worldmark dues.  If a Worldmark member fails at any time to pay the monthly

10  TravelShare fee, the member loses his membership in TravelShare.  If the member then wants to rejoin

11  TravelShare again, the member must purchase another 5,000 Vacation Credits directly from Wyndham.

12       47.    While Vacation Credits are freely transferable, TravelShare is not.  A Worldmark member

13  who has purchased 5,000 additional Vacation Credits from Wyndham to join TravelShare loses the right

14  to sell, rent, borrow or otherwise transfer those Vacation Credits to anyone but a family member,

15  without losing membership in TravelShare.  Thus, a Worldmark member who must go to the significant

16  expense of joining TravelShare simply to maintain his or her right to have first-come, first-served access

17  to short-term reservations is, as a result, giving up the right to sell or rent all of his/her Vacation Credits

18  on the open-market.

19       48.    Future potential Worldmark members who purchase Vacation Credits on the open market

20  also cannot join TravelShare, even if they thereafter purchase additional Vacation Credits directly from

21  Wyndham.

22       49.    In short, the restrictions in the TravelShare program will destroy the resale market for

23  Vacation Credits and impede existing Worldmark members from freely transferring their Vacation

24  Credits, as they have the right to do.  The restrictions force prospective purchasers of Vacation Credits

25  to purchase Vacation Credits exclusively from Wyndham (at a considerably higher price), rather than on

26  the resale market.  As a result of TravelShare, the Vacation Credits owned by existing Worldmark

27  members now are worth less than those sold by Wyndham.

28

### 2.  In Order to Sell More Vacation Credits, Wyndham Improperly Limits the Availability of Bonus Time and Increases Usage at Worldmark Resorts

50.  From Worldmark's inception in 1989 through 2003, when each new resort (excluding the exotic resorts) was transferred from Wyndham to Worldmark, three weeks' worth of Vacation Credits were set aside and not sold, to ensure the availability of Bonus Time for Worldmark members. However, when Wyndham acquired Trendwest, it unilaterally decided to ignore this key right and benefit, and began setting aside only one week worth of Vacation Credits for Bonus Time availability at all new Worldmark resorts. This is true not only for the 15 new Worldmark resorts added since 2004, but even for the additional units added to some of the existing Worldmark resorts for which only 48 weeks worth of Vacation Credits were sold.

51.  Wyndham's unilateral decision to set aside only one week for Bonus Time violates the Governing Documents and is contrary to the interests of Worldmark members, as it allows Wyndham to sell more Vacation Credits, thus increasing the usage of and decreasing the availability at all Worldmark resorts. Of course, Wyndham profits from this by being able to sell 4% more Vacation Credits than it otherwise would be entitled to (without any offsetting increase in cost) for each new resort or additional units added to an existing resort.

### 3.  Wyndham Abandons the Relative Use-Value Provisions of the Governing Documents in Order to Sell More Vacation Credits

52.  The Governing Documents require that Wyndham allocate credit values for each new resort based on the relative use-value of the new resort compared to existing resorts. From Worldmark's inception in 1989 until shortly after Wyndham acquired Trendwest, 47 resorts were added to Worldmark (with the exception of the exotic locations), and they all had the same or essentially the same credit values, reflecting the fact that every resort, regardless of location, had the same relative use-value to Worldmark members. This was true even though these resorts were located in Canada, throughout the United States and in Mexico, and even though these resorts were built over a period of more than 14 years.

53.  Trendwest, the developer at the time, was compensated for any increases in development and construction costs, not by increasing credit values over time and then selling more Vacation Credits

14

as a result, but by increasing the costs of the Vacation Credits sold over time. This also benefited existing members by increasing the value of their Vacation Credits and ensuring that new resorts would "cost" the same to use as existing resorts.

54.     Wyndham quickly abandoned the relative use-value concept when it acquired Trendwest. Because Wyndham cannot increase the cost of Vacation Credits to pay for any increased development and construction costs (due in part to competition from the resale market), it has instead unilaterally decided to ignore the key provisions of the Governing Documents and set credit values at new resorts based on the purported development costs of those resorts rather than the relative use-value of the new resorts compared to existing resorts. As a result, most of the new resorts that have been developed by Wyndham since the acquisition have had substantially higher credit values than all of the existing resorts. For example, all of the non-exotic resorts added between 1989 and 2003 set the credit value for a one bedroom at peak time at either 8,000 or 9,000 Vacation Credits for a week. The San Diego location, added in 2006, set the value of a one bedroom at 15,000 Vacation Credits for a week, while the Taos location, to be added in 2008, will value a one bedroom at 13,000 Vacation Credits for a week. Many existing Worldmark members, who purchased based upon a well-established history of consistent relative use-values for all resorts, will either have to purchase more Vacation Credits to be able to use these new resorts or simply avoid the new resorts. This violates the Governing Documents and representations made by Wyndham to prospective purchasers that by joining Worldmark, they are purchasing tomorrow's vacation at today's prices.

### 4.     Wyndham Prematurely Reserves Hundreds of Units at Worldmark Resorts for Sales Purposes in Violation of the Governing Documents

55.     The Governing Documents place many restrictions on Wyndham's ability to use existing Worldmark resorts for its own purposes, particularly sales purposes. Wyndham generally cannot enter into any transaction which can cause a loss of usage at the resorts for Worldmark members. Specifically, Wyndham cannot make reservations using its Vacation Credits more than 45 days before arrival, and must otherwise comply with all of the restrictions on reservations that apply to Worldmark members. One of these restrictions is that for a reservation made during the peak periods (red weeks), the reservation must be for a full week if booked more than 90 days before arrival.

56.     Wyndham recently began reserving for its own sales purposes hundreds of units at popular resorts during peak periods.  The units are blocked months in advance and for weekends only.  These reservations were made by Wyndham more than 45 days before arrival and are for less than one week, but booked more than 90 days before arrival.  While denominated as "Party Weekends" on Worldmark's website, these weekends are in fact sales presentations whereby an existing Worldmark owner can bring up to 12 other prospective members (couples) to a popular Worldmark resort for a modest cost.  The weekends always include a tour, sales presentation and usually some other activity.

57.     Wyndham's use of Worldmark resorts in this manner for sales purposes violates the Governing Documents and limits the ability of existing Worldmark members to book reservations (using either Vacation Credits or Bonus Time) at popular destinations.

**5.       Worldmark's Board of Directors, Dominated and Controlled by Wyndham, Assists Wyndham in Violating the Governing Documents and Maintaining its Control of Worldmark's Board**

58.     The Director Defendants have either actively assisted Wyndham in its violation of the Governing Documents and actions contrary to the interests of Worldmark members, or have failed to take any action on behalf of Worldmark members to enforce their rights under the Governing Documents and to force Wyndham to refrain from violating the Governing Documents and harming the interests of Worldmark members.  Defendants Herrick and Fry participated in the creation of TravelShare, and they and the other Director Defendants have done nothing to stop its implementation.  The Director Defendants also have taken no action against Wyndham to protect Worldmark members from Wyndham's decision to abandon the Governing Documents and sell more Vacation Credits than it is entitled to by decreasing the availability of Bonus Time and inflating credit values at new resorts and existing resorts where additional units are added.  Finally, the Director Defendants have taken no action to prevent Wyndham from improperly reserving hundreds of units at popular Worldmark resorts for its own sales purposes.

59.     Instead, the Director Defendants have taken actions to perpetuate Wyndham's domination and control of Worldmark and its Board of Directors by manipulating the election process and improperly limiting the ability of Worldmark members to obtain information about Worldmark that they

1   are entitled to under the Governing Documents.

2        60.    In order to ensure that Wyndham can continue to control Worldmark for its own benefit

3   rather than for the benefit of Worldmark members, Wyndham and the Director Defendants have taken a

4   number of steps to prevent any serious challenges to the Director Defendants' ability to control the

5   Board.  They shut down the owners' forum on the Worldmark website after Worldmark members started

6   to complain about changes being implemented when Wyndham took over.  While a new forum now is

7   available for Worldmark owners, it is actively monitored by Wyndham employees and negative

8   comments or discussion about Worldmark's Board or Wyndham are not permitted.

9        61.    The Governing Documents provide that any Worldmark member may request and review

10   a copy of the membership register for any purpose reasonably related to the member's interests as a

11   Worldmark member.  However, the Director Defendants unilaterally have decided that the membership

12   register will not be provided to any Worldmark member, regardless of the purpose for which it is sought.

13   This prevents Worldmark members from communicating directly with other members in an effort to

14   challenge the actions of the Director Defendants.

15        62.    The Governing Documents provide that any Worldmark member in good standing can run

16   for election to the Board.  However, recently, the Board has announced that it will pre-screen applicants

17   and that the Board will decide which members can run against it in future elections.  The Board has used

18   proxy votes to ensure that the candidates it wants elected receive enough votes to win, contrary to the

19   interests of those Worldmark members who have voted and indicated a preference for other candidates.

20   On several occasions, the Board has avoided the election process entirely for new Wyndham employees

21   joining the Board, by having a Wyndham employee on the Board run for reelection as an incumbent and

22   then resign a few months later, to be replaced (by appointment, not election) by the new Wyndham

23   employee, who can then run in the next election as an incumbent.

24   **IV.**

25   **TOLLING OR NON-ACCRUAL OF STATUTE OF LIMITATIONS**

26        63.    Any applicable statutes of limitations have been tolled or have not run because

27   Defendants knowingly and actively concealed and denied the facts as alleged herein.  Defendants had

28   actual or constructive knowledge of the wrongful courses of action alleged here.  Plaintiffs and Class

1   members have been kept in ignorance of information essential to the pursuit of their claims, without any

2   fault or lack of diligence on their part. Plaintiffs and Class members did not discover the facts

3   constituting Defendants' unlawful business practices until a date within the limitations period governing

4   this action, and promptly exercised due diligence by filing this complaint. Plaintiffs and Class members

5   were not at fault for failing to discover Defendants' misconduct sooner, and had no actual or

6   presumptive knowledge of the facts of Defendants' misconduct to put them on inquiry notice. Plaintiffs

7   and Class members could not reasonably have discovered Defendants' misrepresentations and/or

8   material omissions before November 5, 2006. Therefore, their claims accrued on that date, and/or any

9   applicable statutes of limitations were tolled until that date.

10      64.   Defendants were and are under a continuing duty to disclose all material facts concerning

11   ownership interests in Worldmark to Plaintiffs and Class members. Because of Defendants'

12   concealment of material information concerning Worldmark, Defendants are estopped from relying on

13   any statute of limitations defense.

## V.

## CLASS ACTION ALLEGATIONS

16      65.   Plaintiffs bring this action on behalf of themselves and all other similarly situated persons

17   as members of a Class defined as follows: All persons who purchased Worldmark Premier Vacation

18   Credits before November 5, 2006 and who reside in the State of California or who purchased Vacation

19   Credits in California (the "Class"). Excluded from the Class are Defendants, any entity in which any

20   Defendant has or had a controlling interest, any entity which has or had a controlling interest in

21   Wyndham, any officers or directors of Wyndham, the legal representatives, heirs, successors, and

22   assigns of Defendants, and any judge assigned to this action and his or her immediate family.

23      66.   This action has been brought and may be properly maintained pursuant to the provisions

24   of Rule 23 of the Federal Rules of Civil Procedure.

25      67.   **Numerosity** -- Fed. R. Civ. P. 23(a)(1): Members of the Class are so numerous and

26   widely dispersed that joinder of them in one action is impracticable. Wyndham promotes, markets and

27   sells Worldmark Vacation Credits to consumers throughout California and manages fifteen Worldmark

28   resorts in California, many of which have Wyndham sales offices. While the precise number of Class

members is unknown to Plaintiffs at this time, the Class is believed to number in the tens of thousands.
Because Wyndham manages Worldmark, and Worldmark maintains a list of all of its current members
and their mailing addresses, the identity of each and every Class member is readily ascertainable from
information and records in Defendants' possession or control.  Class members may be notified of the
pendency of this action by first-class or electronic mail, supplemented (if deemed necessary or
appropriate by the Court) by published notice.

68.   **Common Questions of Fact and Law** -- Fed. R. Civ. P. 23(a)(2), (b)(3):  Common
questions of law and fact exist as to all members of the Class and predominate over any questions
affecting only individual Class members.  These common legal and factual questions include, but are not
limited to, the following:

  (a) Whether the Governing Documents create a contract between Wyndham and
    Worldmark members;

  (b) Whether Wyndham has the right under the Governing Documents to unilaterally
    impose TravelShare upon existing Worldmark members;

  (c) Whether Wyndham's unilateral imposition of TravelShare on existing Worldmark
    members constitutes a breach of contract by Wyndham;

  (d) Whether Wyndham's unilateral imposition of TravelShare on existing Worldmark
    members constitutes a breach of the covenant of good faith and fair dealing by
    Wyndham;

  (e) Whether TravelShare causes a loss of usage of Worldmark resorts by Worldmark
    members;

  (f) Whether TravelShare reduces the availability of Bonus Time reservations for
    existing Worldmark members;

  (g) Whether TravelShare restricts the free transfer of Vacation Credits by Worldmark
    members;

  (h) Whether TravelShare diminishes the value of Vacation Credits owned by existing
    Worldmark members;

(i)     Whether Wyndham has the right under the Governing Documents to unilaterally abandon the practice of setting aside three weeks at each new resort to ensure Bonus Time availability;

(j)     Whether Wyndham's unilateral abandonment of the practice of setting aside three weeks at each new resort to ensure Bonus Time availability constitutes a breach of contract by Wyndham;

(k)     Whether Wyndham's unilateral abandonment of the practice of setting aside three weeks at each new resort to ensure Bonus Time availability constitutes a breach of the covenant of good faith and fair dealing by Wyndham;

(l)     Whether Wyndham has the right under the Governing Documents to unilaterally abandon the relative use-value concept;

(m)     Whether Wyndham's unilateral abandonment of the relative use-value concept constitutes a breach of contract by Wyndham;

(n)     Whether Wyndham's unilateral abandonment of the relative use-value concept constitutes a breach of the covenant of good faith and fair dealing by Wyndham;

(o)     Whether Wyndham's use of Worldmark resorts for sales purposes as described herein violates the Governing Documents;

(p)     Whether the Governing Documents are materially misleading and/or conceal material information concerning Worldmark membership;

(q)     Whether Wyndham failed to disclose, inadequately disclosed, or concealed material information concerning Worldmark membership and the purchase and/or ownership of Worldmark Vacation Credits;

(r)     Whether Wyndham's sales, advertising and marketing practices in connection with the sale of Worldmark Vacation Credits are likely to deceive a reasonable person;

(s)     Whether Defendants' business practices, as described herein, are unlawful, unfair and/or fraudulent;

AMENDED COMPLAINT

(t)     Whether Wyndham's business practices, as described herein, violate the Final Judgment and Permanent Injunction entered in *The People of the State of California v. Trendwest Resorts, Inc.*, CIV43529, in November, 2003;

(u)     Whether the Director Defendants have violated their fiduciary duties;

(v)     Whether Defendants' wrongful conduct damaged Plaintiffs and Class members; and

(w)     Whether Plaintiffs and Class members are entitled to declaratory, injunctive and/or equitable relief.

69.     **Typicality** -- Fed. R. Civ. P. 23(a)(3):  Plaintiffs' claims are typical of the claims of the members of the Class in that Plaintiffs and all Class members purchased Premier Vacation Credits pursuant to uniform offering documents prior to November 5, 2006, and currently own those Vacation Credits.

70.     **Adequacy** -- Fed. R. Civ. P. 23(a)(4):  Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs have no interests that are adverse or antagonistic to those of the Class.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

71.     **Superiority** -- Fed. R. Civ. P. 23(b)(3): A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The economic harm suffered by each individual Class member may be limited.  Given the size of individual Class members' claims, the expense and burden of individual litigation make it economically infeasible and procedurally impracticable for Class members to seek redress individually for the wrongs done to them.  The likelihood of individual Class members prosecuting separate claims is exceedingly remote, and even if the members of the Class could afford individual litigation, given the size of the Class, the court system could not.  Individual litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case.  By contrast, a class action will present far fewer management difficulties, promote an orderly and expeditious administration and adjudication of the class claims, foster economies of scale, ensure uniformity of decisions, and provide comprehensive supervision by a single court.

72.　In the alternative, the Class may be certified because:

(a)　The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct for Defendants;

(b)　the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

(c)　Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## FIRST CAUSE OF ACTION

### Breach of Contract

73.　Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein. This claim is brought on behalf of Plaintiffs and the Class against Wyndham.

74.　At all relevant times, a contract existed between Plaintiffs and Class members, on the one hand, and Wyndham, on the other.  The contract is embodied in writing in the Governing Documents, which are uniform in all material respects for Plaintiffs and Class members.

75.　Pursuant to the Governing Documents, Wyndham agreed, among other things, to:

(a)　Enter into no transaction which would cause a loss of usage of the Worldmark resorts by Worldmark members;

(b)　Maintain no ownership interest in the Worldmark resorts once they are transferred to Worldmark;

(c)　Manage the Worldmark resorts for the benefit of Worldmark members;

(d)　Honor all advance and short-term reservations on a first-come, first-served basis;

(e)     Honor only two types of reservations (Vacation Credits and Bonus Time),
unless directed to do otherwise by Worldmark and its members;

(f)     Implement the reservation guidelines and rules established by Worldmark and
its members;

(g)     Allocate credit values for new resorts based on the relative use-value of new
resorts compared to existing resorts;

(h)     Set aside at each resort (except exotic resorts) the Vacation Credit equivalent
of three weeks per year which cannot be sold or offered for sale or rented
(until after Worldmark members have an opportunity to make Bonus Time
reservations) so that time is available for Bonus Time reservations by
Worldmark members;

(i)     Permit the free transferability of Vacation Credits by Worldmark members;

(j)     Provide for only two forms of ownership of Vacation Credits; and

(k)     Manage and operate Worldmark in manner consistent with the Governing
Documents.

76.     By its actions alleged herein, Wyndham breached its contract with Plaintiffs and Class
members by unilaterally imposing Travelshare on Worldmark members, impairing the ability of
Worldmark members to use Worldmark resorts, exercising a continued ownership interest in the
Worldmark properties, managing the Worldmark resorts for its own benefit rather than for the benefit of
Worldmark members, giving priority to TravelShare members for short-term reservations, honoring
more than two types of reservations without the approval of Worldmark and its members, implementing
a reservations system not consistent with the guidelines and rules established by Worldmark and its
members, inhibiting the free transfer of Vacation Credits by Worldmark members, taking actions to
diminish the value of the Vacation Credits owned by Worldmark members, failing to allocate credit
values at new resorts based on the relative use-value of new resorts compared to existing resorts, failing
to set aside weeks to ensure availability of Bonus Time reservations, and generally managing and
operating Worldmark for its own benefit rather than for the benefit of Worldmark and its members in a
manner inconsistent with the Governing Documents.

77.   At all times, Plaintiffs and Class members fully performed under the Governing Documents.

78.   Because of Wyndham's breach of its contract with Plaintiffs and Class members, Plaintiffs and Class members have suffered damage, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

79.   Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein. This claim is brought on behalf of Plaintiffs and the Class against Wyndham.

80.   Under an implied term of the contract between Wyndham and Plaintiffs and Class members, identical in all material respects and necessary to carry out the intent of the parties, Plaintiffs and Class members reasonably expected that they would always have access to Worldmark's reservation system on a first-come, first-served basis for all reservations, that there would never be more than two types of reservations unless agreed to by a majority of the Worldmark members, that Wyndham would take no action that might cause a loss of usage by Worldmark members, that their Vacation Credits would be equal in all respects to the Vacation Credits offered for sale by Wyndham, that new resorts would have the same relative use-value as existing resorts, and that for each new resort, time would be set aside to ensure the availability of Bonus Time reservations.

81.   By its actions, described above, Wyndham has deprived Plaintiffs and Class members of the benefit of their bargains, and breached the implied covenant of good faith and fair dealing inherent in the contracts between Wyndham and all Worldmark members.  Wyndham has unilaterally imposed Travelshare on Worldmark members, impaired the ability of Worldmark members to use Worldmark resorts, exercised a continued ownership interest in the Worldmark properties, managed the Worldmark resorts for its own benefit rather than for the benefit of Worldmark members, given priority to TravelShare members for short-term reservations, honored more than two types of reservations without the approval of Worldmark and its members, implemented a reservations system not consistent with the guidelines and rules established by Worldmark and its members, inhibited the free transfer of Vacation Credits by Worldmark members, taken actions to diminish the value of the Vacation Credits owned by Worldmark members, failed to allocate credit values at new resorts based on the relative use-value of

new resorts compared to existing resorts, failed to set aside weeks to ensure availability of Bonus Time reservations, and generally managed and operated Worldmark for its own benefit rather than for the benefit of Worldmark and its members in a manner inconsistent with the Governing Documents.

82.     Because of such breach, Plaintiffs and Class members have suffered damages, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### Violation of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*.

83.     Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein. This claim is brought on behalf of Plaintiffs and the Class against Wyndham.

84.     Wyndham is a "person" within the meaning of Civil Code §§ 1761(c) and 1770, and provides "goods" or "services" within the meaning of Civil Code §§ 1761(b) and 1770.

85.     Plaintiffs and members of the Class are "consumers" within the meaning of Civil Code §§ 1761(d) and 1770.

86.     Each purchase of WorldMark Vacation Credits constitutes a "transaction" within the meaning of Civil Code §§ 1761(e) and 1770.

87.     As set forth herein, Wyndham's acts, practices, representations, omissions, and courses of conduct with respect to the marketing and sale of Worldmark Vacation Credits and management of Worldmark violate § 1770 of the Consumers Legal Remedies Act in that Wyndham: (a) represented that Worldmark Vacation Credits and Worldmark membership have characteristics, uses, and benefits which they do not have; (b) represented that Worldmark Vacation Credits and Worldmark membership are of a particular standard, quality, or grade when they are of another; (c) advertised Worldmark Vacation Credits and Worldmark membership with intent not to sell them as advertised; (d) represented that the purchase of Worldmark Vacation Credits and Worldmark membership confers or involves rights, remedies, or obligations which it does not have or involve; (e) represented that the purchase of Worldmark Vacation Credits and Worldmark membership was in accordance with previous representations, when it was not; and (f) inserted unconscionable provisions in the Governing Documents.

88.     Pursuant to the provisions of Civil Code § 1780, Plaintiffs and Class members

1   seek an order for declaratory relief, an order enjoining the methods, acts and practices complained of

2   herein, and any other relief the Court deems proper.

3   ## FOURTH CAUSE OF ACTION

4   ### Unlawful, Unfair and Fraudulent Business Practices in Violation of
    ### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

5

6   89.     Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

7   This claim is brought on behalf of Plaintiffs and the Class against Wyndham.

8   90.     The acts and practices engaged in by Wyndham, and described herein, constitute

9   unlawful, unfair and/or fraudulent business practices, in that: (a) Wyndham's practices violate the letter

10  and policy of the Consumers Legal Remedies Act; and/or (b) Wyndham's practices violate the Final

11  Judgment and Permanent Injunction entered in *The People of the State of California v. Trendwest*

12  *Resorts, Inc.*, CIV43529, in November, 2003; and/or (c) the justification for Wyndham's conduct is

13  outweighed by the gravity of the consequences to Plaintiffs and Class members; and/or, (d) Wyndham's

14  conduct is immoral, unethical, oppressive, unscrupulous or substantially injurious to Plaintiffs and Class

15  members; and/or, (e) the conduct of Wyndham constitutes fraudulent, untrue or misleading actions in

16  that such conduct has a tendency to deceive Plaintiffs and Class members, and/or (f) Wyndham's

17  conduct violates and contradicts California's prohibition and policies against bad faith and unfair

18  dealing, and/or (g) Wyndham's practices violate the letter and policy of the Vacation Ownership and

19  Time-Share Act of 2004.  Such conduct violates California Business & Professions Code §§ 17200, *et*

20  *seq.*

21  91.     Plaintiffs and Class members have suffered injury in fact and have lost money or property

22  as a result of Wyndham's unlawful, unfair and fraudulent business practices, as described herein.

23  92.     Pursuant to California Business and Professions Code § 17203, Plaintiffs and Class

24  members therefore are entitled to equitable relief, including restitution, disgorgement of all profits

25  accruing to Wyndham because of its unlawful, unfair, and fraudulent business practices, and a

26  permanent injunction enjoining Wyndham from engaging in the unlawful, unfair, and fraudulent acts

27  and practices described herein.

28  93.     Wyndham's unlawful, unfair and fraudulent business acts and practices are described

26

herein and include, but are not limited to, the following:

(a)    Wyndham misrepresented and/or failed to disclose material facts concerning Worldmark and Worldmark Vacation Credits;

(b)    Wyndham unilaterally imposed additional obligations upon existing Worldmark members;

(c)    Wyndham unilaterally altered the terms and features of Worldmark membership;

(d)    Wyndham breached its contract with existing Worldmark members, as described in Paragraphs 75 and 76 above;

(e)    Wyndham diluted the use and value of WorldMark Vacation credits owned by existing Worldmark members who have not signed up for the TravelShare program;

(f)    Wyndham falsely represented that all WorldMark members held equal rights to make Vacation Credit Reservations and Bonus Time Reservations on a first-come, first-reserved basis within time periods that applied to all Worldmark members equally;

(g)    Wyndham falsely represented that credit values would be allocated at all new resorts based on the relative use-value as compared to existing resorts;

(h)    Wyndham falsely represented that weeks would be allocated in a manner so at to ensure the availability of Bonus Time reservations for Worldmark members; and

(i)    Wyndham violated Paragraphs 3(K), 3(M), 3(N), and 3(O) of the Final Judgment and Permanent Injunction entered in *The People of the State of California v. Trendwest Resorts, Inc.*, CIV43529, in November, 2003, which forbids: "failing to disclose that an association decision could result in a diminution of vacation credit values," materially misrepresenting the "availability of services," "materially misrepresenting the quantity of vacation credits sufficient to obtain any other benefit or service," and "materially misrepresenting the ability or ease with which an owner may make a reservation."

## FIFTH CAUSE OF ACTION

### Breach of Fiduciary Duty

94.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein. This claim is brought on behalf of Plaintiffs and the Class against the Director Defendants.

95.     As directors of Worldmark, a California corporation, the Director Defendants are fiduciaries and owe the highest duty of loyalty, care and good faith to Worldmark and its members. As fiduciaries, the Director Defendants are required to place the interests of Worldmark and its members ahead of their own self-interests and the interests of their employer, Wyndham. The Director Defendants have breached their duty to Worldmark members by assisting Wyndham in its violation of the Governing Documents and actions contrary to the interests of Worldmark members. The Director Defendants have breached their duty to Worldmark members by refusing to take any action on behalf of the Worldmark members to enforce their rights under the Governing Documents and to force Wyndham to refrain from violating the Governing Documents and harming the interests of Worldmark members.

96.     The Director Defendants have failed to perform their duties as directors of Worldmark in good faith and with due care and have failed to make reasonable inquiries into the actions alleged herein. Plaintiffs and the Class have been damaged by the Director Defendants breaches of fiduciary duty.

## SIXTH CAUSE OF ACTION

### For Declaratory Relief Pursuant to Code of Civil Procedure § 1060

97.     Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein. This claim is brought on behalf of Plaintiffs and the Class against all Defendants.

98.     An actual controversy exists between the parties relating to the legal rights and duties of Plaintiffs and Class members and Wyndham for which Plaintiffs and Class members desire a declaration of their rights.

99.     A declaratory judgment is necessary to determine Plaintiffs' and Class members' rights and Wyndham's duties in connection with Wyndham's TravelShare program, including, among other things, a declaration that the TravelShare program constitutes a breach of contract by Wyndham, that Wyndham may not unilaterally impose the TravelShare program on Worldmark members, and that Wyndham may not alter the features or benefits of Worldmark membership without the express consent of Worldmark members.

///

///

///

AMENDED COMPLAINT

### SEVENTH CAUSE OF ACTION

### Violation of the Vacation Ownership and Time-Share Act of 2004, Cal. Bus. & Prof. Code § 11210, *et seq.*

100.   Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein. This claim is brought on behalf of Plaintiffs and the Class against Wyndham.

101.   Plaintiffs are owners of time-share interests purchased in California and are permitted to sue under the Time-Share Act by California Business & Professions Code § 11285.

102.   Wyndham is a developer and a marketer of time-share interests as well as a manager of time-share interests and, therefore, a proper defendant under the Time-Share Act, Cal. Bus. & Prof. Code § 11285.

103.   As set forth herein, Wyndham's acts, practices, representations, omissions, and courses of conduct with respect to the marketing and sale of Worldmark Vacation Credits and management of Worldmark violate § 11245(a)(3) of the Vacation Ownership and Time-Share Act of 2004 in that Wyndham materially misrepresented the nature, qualities, or characteristics of the offered time-share plan by describing memberships in Worldmark as holding equal rights to all other memberships with respect to the use of Bonus Time.

104.   Pursuant to the provisions of Civil Code § 11285, Plaintiffs and Class members seek an order for declaratory relief, an order enjoining the methods, acts and practices complained of herein, and any other relief the Court deems proper.

### VI.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendants as follows:

a.   For an order certifying the proposed Class herein under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiffs and their counsel of record to represent said Class;

b.   For an order that Defendants be permanently enjoined from engaging in the unlawful activities and practices complained of herein;

AMENDED COMPLAINT

    c.    For an order awarding restitution and disgorgement of all money paid by Plaintiffs and Class members because of Defendants' unlawful, unfair, and/or fraudulent business practices complained of herein;

    d.    For an order imposing a constructive trust for the benefit of Plaintiffs and Class members upon all money collected by Wyndham from the unlawful, unfair, and/or fraudulent business practices and activities complained of herein;

    e.    For declaratory relief as this Court deems appropriate;

    f.    For actual damages to be awarded to Plaintiffs and Class members;

    g.    For attorneys' fees and costs of suit, including expert witness fees;

    h.    For an order awarding pre-judgment and post-judgment interest as prescribed by law; and

    i.    For such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable.

DATED: September 14, 2007        Respectfully submitted,

**GIRARD GIBBS LLP**

By: _____
        Jonathan K. Levine

Elizabeth C. Pritzker
Daniel T. LeBel
601 California Street
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Attorneys for Individual and Representative
Plaintiffs Clarke and Rebecca Wixon and Norman
and Barbara Wixon

AMENDED COMPLAINT